CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 11 2010

JULIA C. DUDLEY, CLERK
BY: /s/ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| MCKAY CONSULTING, | ) |
| Plaintiff, | ) Civil Action No. 5:09CV00054 |
| v. | ) **MEMORANDUM OPINION** |
| ROCKINGHAM MEMORIAL HOSPITAL, | ) By: Hon. Glen E. Conrad |
| Defendants. | ) Chief United States District Judge |

This case is presently before the court on the defendant's motion for summary judgment, the plaintiff's cross-motion for partial summary judgment, and the plaintiff's motion to amend the complaint. For the reasons that follow, the court will grant the defendant's motion and deny the plaintiff's motions.

## Background

The plaintiff, McKay Consulting, Inc. ("McKay"), is a Louisiana corporation that works with hospitals across the country to increase reimbursement rates from government-sponsored programs, such as Medicare. The defendant, Rockingham Memorial Hospital ("RMH"), is a hospital located in Harrisonburg, Virginia. On July 16, 2009, McKay filed a complaint against RMH asserting five claims, two of which remain. In Count One, McKay seeks a declaratory judgment that the parties entered into an oral contract. In Count Two, which is pled in the alternative, McKay seeks a judgment declaring that the parties entered into an implied-in-fact contract.

This case centers around an idea allegedly discovered by McKay that would increase Medicare reimbursements for certain hospitals.[1] McKay determined which hospitals could benefit from the idea, and calculated the estimated reimbursements that each hospital would receive if the idea was implemented. Through this analysis, McKay identified RMH as a hospital that could benefit from the idea. Specifically, McKay estimated that, by implementing the idea, RMH could gain approximately $8,000,000 per year in Medicare reimbursements with an initial loss of approximately $2,000,000.

Prior to contacting RMH, McKay approached several other hospitals that could potentially benefit from implementing the idea. In March of 2009, McKay contacted New Hanover Regional Medical Center ("New Hanover"), which McKay had estimated could gain approximately $7,000,000 per year in reimbursements, with an estimated initial loss of $1,400,000. Bob Brown, an independent contractor who had the authority to propose terms and conditions of service to prospective clients on behalf of McKay, contacted New Hanover by email on March 17, 2009. The email stated, in pertinent part, as follows:

> As Mike said, we feel that this is an important issue for your hospital. One that could/should result in several millions of additional Medicare reimbursement.
>
> . . .
>
> If the staff is unaware and wishes to address the issue, they'll do it with us on a contingency fee of 20% of the increased Medicare reimbursement for the first four (4) years we feel we can have an effect . . . .

---

[1] McKay has asserted that RMH agreed to keep the nature of this idea confidential as part of its alleged contract with McKay, and the parties entered a stipulated protective order for the purpose of protecting the idea during the course of this litigation. Although the court ultimately concludes that the alleged contract is unenforceable, the court will refrain from specifically identifying or describing the idea in this opinion. As will be discussed infra, it is undisputed that an RMH representative specifically agreed that the hospital would keep the idea confidential.

> If you reflect on the above description: the hospitals will only pay us if we address a problem that you were unaware of in the first place. It is an imminently fair offer.
>
> The additional reimbursement available to New Hanover Regional Medical Center is surely in excess of $2,000,000. The people of the area will be well served if this issue is addressed.

(RMH Ex. 33). In response, Susan Shovlin, New Hanover's Director of Reimbursement, advised Brown that she did not believe that such a vague proposal could support a four-year, uncapped agreement of 20 percent. Shovlin opined that "in a very difficult financial time, this [would be] making a very uninformed decision." (RMH Ex. 33). McKay later offered to "lower [its] fee offer from 20% to 15% and cap the affected years at three (3) instead of the four (4)" it initially proposed. (RMH Ex. 33). However, Ms. Shovlin ultimately cancelled New Hanover's meeting with McKay, stating that the hospital had "never been asked to do anything like this and can't agree to [McKay's] terms." (RMH Ex. 33).

In April of 2009, McKay contacted Flagler Hospital ("Flagler"), which it had estimated could gain approximately $8,500,000 per year by implementing the idea, with an upfront loss of approximately $500,000. Mr. Brown advised Flagler that the issue concerned reimbursement, and that the magnitude of the benefit was $5,000,000. Flagler ultimately decided not to move forward with McKay. As it turned out, the hospital was able to identify the issue and implement it without the use of a consultant.

Mr. Brown also contacted St. Cloud Hospital ("St. Cloud") in April of 2009, which McKay had estimated could gain $6,700,000 per year by implementing the idea, with an upfront loss of approximately $4,500,000. Mr. Brown informed St. Cloud that the potential benefit was in excess of $2,000,000. McKay subsequently learned that St. Cloud had also been contacted by

3

several other firms regarding "a large Medicare reimbursement issue worth from 7 to 11 mil." (RMH Ex. 41). St. Cloud informed McKay that it was aware of the nature of the idea and that it was not interested in paying a contingency fee, but that it would make a decision on which firm to use in implementing the idea. St. Cloud ultimately declined to use McKay.

The following month, McKay initiated contact with RMH. As previously stated, McKay had estimated that RMH could gain approximately $8,000,000 per year by implementing the idea, with an initial loss of approximately $2,000,000. On May 18, 2009, Mr. Brown spoke with Susan Holsinger, RMH's Director of Accounting and Finance, by telephone.[2] During the phone conversation, Mr. Brown indicated that McKay had identified a reimbursement issue that affected RMH. Although Ms. Holsinger asked Mr. Brown to be more specific, he refused to disclose the nature of the idea. Mr. Brown and Ms. Holsinger arranged a meeting for June 3, 2009.

Following the phone conversation, Mr. Brown sent Ms. Holsinger an email confirming the date of the meeting. The email further stated as follows:

> As we discussed, we are pretty sure that we've identified a significant reimbursement issue affecting your hospital. We did most of this using electronic copies of your cost reports. And there is always the chance that the information we have is in error. But the information has proven very accurate so far. The issue is in excess of $500,000 per year, and affects more than one year. We're not sure right now how many years, but it's more than one.
>
> There is also the chance that you've already addressed, or at least identified, the issue. Again, I don't think this will be the case. If you have you'll almost certainly have no need for our services. Although one

---

[2] Ms. Holsinger is, among other things, responsible for managing RMH's Medicare reimbursements.

> hospital had identified it and still choose [sic] to hire us. We wouldn't expect that to normally be the case.

(RMH Ex. 43). Based on these exchanges, Ms. Holsinger set the June 3, 2009 meeting on the calendar for herself and Jennifer Riner, a financial and reimbursement analyst at RMH, with the notation that "[c]onsultant thinks he has something that will get us $500,000 per year in the Medicare cost report. More information to follow." (RMH Ex. 44).

On May 22, 2009, Mr. Brown sent a letter to Ms. Holsinger, which again confirmed the June 3, 2009 meeting. The letter stated that "[w]e all remain comfortable that we have [the issue] correct. We know the regulations and accounting are correct. The one, very unlikely possibility is that the cost report data we have is in error. We'll talk more about all of this Wednesday, June 3rd at 9:30 a.m. You'll be pleased." (RMH Ex. 45) (emphasis in original).

Thereafter, on May 26, 2009, Mr. Brown sent another email to Ms. Holsinger, which contained the terms of the alleged contract that McKay now seeks to enforce:

> From our discussion I don't believe that you are aware of, or working on, the issue. But if you are you'll have no obligation to us whatsoever. Fix it yourself or with the help of whomever you please. And tell whoever you like about the matter. If you aren't aware of the issue we'll ask that you do keep its nature confidential, and that if you choose to address it, you'll use McKay Consulting as your agent. Our fee would be 20% of the adjustment for up to four (4) years adjustment after it has materialized. If our work results in less than four years of adjustments, the fee would only apply to the actual amount. Right now, the number of years affected is one of the uncertainties of the project.

(RMH Ex. 46). That same day, Mr. Brown emailed a McKay employee and asked her to make sure that Mr. McKay brought a proposed written agreement with him to the June 3, 2009 meeting with RMH.

5

On June 3, 2009, Mr. Brown and McKay's president, Michael McKay, met with Ms. Holsinger and Ms. Riner at RMH. During their initial discussion, and prior to the disclosure of McKay's idea, Mr. Brown asked whether RMH was currently working on any reimbursement issues. Although Ms. Holsinger identified a couple of reimbursement issues that the hospital was in the process of reviewing, it is undisputed that Ms. Holsinger did not mention McKay's idea.

Mr. Brown also discussed the issue of confidentiality. With regard to that issue, Mr. Brown testified at his deposition that he "wanted to make sure that Ms. Holsinger was familiar with the terms and conditions under which we were going to go forward with the meeting. So we talked about the awareness issue, if you're working on it. If you're not working on it, you have a confidential agreement with us." (Brown Dep. at 91). It is undisputed that Ms. Holsinger agreed to keep McKay's idea confidential. When asked during her deposition whether she agreed to keep the idea confidential, Ms. Holsinger testified, "yeah, out of professional courtesy. You know, you bring me an idea and I didn't know about it or I wasn't aware of it, I didn't . . . see any . . . problems with saying we wouldn't tell anybody." (Holsinger Dep. at 78).

As for the proposed fee, Mr. Brown testified that he reviewed the 20 percent payment term again at the outset of the meeting. However, Ms. Holsinger testified that she did not recall any discussion of the payment term at the meeting prior to the disclosure of the idea.

Following their initial discussions, McKay presented a 116-page binder to Ms. Holsinger and Ms. Riner which outlined McKay's idea. The binder included an estimated time line, a financial analysis, RMH's statistical and cost report data, and a 35-page legal opinion by an attorney. It was not until the contents of the binder were presented that RMH learned the true

6

magnitude of the financial benefit associated with McKay's idea, or the fact that RMH would have to absorb a substantial upfront loss before it could obtain increased reimbursements.

After lunch, the group met with Michael King, RMH's Chief Financial Officer. During the meeting, Mr. King asked several questions regarding the terms of McKay's proposal, including whether McKay would indemnify RMH for any losses associated with implementing the idea. Mr. King also challenged the fee that McKay had proposed and endeavored to negotiate the fee.

Over the next several days, Mr. McKay and Mr. King spoke by telephone several times, and the parties continued to exchange information. On June 4, 2009, the day after the parties' meeting, Mr. McKay emailed RMH a two-page proposed written contract, and a message advising that McKay "will be getting back with you later this week to move forward on making sure you all get the answers and comfort you need to move forward should you decide." (RMH Ex. 59; RMH Ex. 60). The proposed agreement included a compensation term of "twenty percent (20%) of the additional reimbursement received by RMH as a result of this Service for the first three (3) years for which the service has a positive effect."[3] (RMH Ex. 60). The agreement further provided that the information disclosed by McKay would be "treated as confidential and a trade secret." (RMH Ex. 60). The agreement also contained a merger clause, which stated that the agreement "constitutes the entire understanding between the parties hereto and all prior negotiations, discussions, understandings, and agreements are . . . to be merged herein." (RMH Ex. 60).

---

[3] During his deposition, Mr. Brown testified that the three-year payment term was a typographical error, and that McKay intended to include a four-year term.

7

On June 8, 2009, Mr. McKay and Mr. King spoke by telephone. During their conversation, Mr. King proposed a flat fee or hourly payment schedule. Mr. McKay rejected Mr. King's suggestions, but indicated that a reduction in fee might be possible. Following a subsequent telephone conversation on June 19, 2009, Mr. McKay sent Mr. King an email stating that "[y]our fee proposal from this morning is a non-starter. If the hospital wants to pursue this further, we need a good faith offer regarding commission percentage by the end of the day today." (RMH Ex. 63). The parties' relationship ultimately broke down and this litigation ensued.

Invoking the court's diversity jurisdiction under 28 U.S.C. § 1332, McKay filed this action against RMH on July 16, 2009. Of the five claims asserted in the original complaint, two remain.[4] In Count One, McKay seeks a declaratory judgment that McKay and RMH entered into an oral contract by which RMH agreed to the following terms: (1) that RMH is obligated to keep McKay's idea confidential; (2) that if it chooses to pursue the idea, RMH is obligated to "[r]etain McKay as its agent to perform the work necessary to implement McKay's idea"; and (3) that McKay is obligated to "[p]ay McKay a fee of 20% of any additional revenues RMH receives as a result of McKay's idea for up to four years." (Compl. at 8).[5] In Count Two, which is pled in the

---

[4] In addition to the remaining claims, McKay asserted claims of promissory estoppel, unjust enrichment, and misappropriation of trade secrets. The parties stipulated to the dismissal of McKay's promissory estoppel claim, and by opinion and order entered October 22, 2009, McKay's claims for unjust enrichment and misappropriation of trade secrets were dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court held that the complaint failed to state a claim for unjust enrichment, since it did not allege that RMH had used or benefitted from McKay's idea. The court held that the misappropriation claim was not viable, since the complaint did not contain sufficient facts to establish that McKay's idea constituted a trade secret under Virginia law.

[5] As previously stated, these terms are taken from Mr. Brown's May 26, 2009 email to Ms. Holsinger.

alternative, McKay seeks a declaratory judgment that McKay and RMH entered into an implied-in-fact contract containing the same three terms.

Following the close of discovery, both parties filed motions for summary judgment. RMH moved for summary judgment as to Counts One and Two, and McKay filed a motion for partial summary judgment as to Count Two alone.

The court held a hearing on the parties' summary judgment motions on July 8, 2010. During the hearing, the court questioned whether it was possible that a viable contract exists that contains only two terms: (1) that RMH will keep McKay's idea confidential; and (2) that RMH will use McKay as its agent if it chooses to pursue the idea. Apparently as a result of the court's inquiry, McKay filed a motion to amend its complaint. Specifically, McKay seeks to amend Counts One and Two to plead, in the alternative, that McKay and RMH entered into an oral or implied-in-fact contract by which (1) "RMH is obligated to keep confidential all information regarding McKay's idea and its nature"; and (2) "RMH is obligated, if it chooses to implement McKay's idea, to . . . [r]etain McKay as its agent to perform the work necessary to implement McKay's idea." (Am. Compl. at 10).

The motions for summary judgment and the motion to amend have been fully briefed and are ripe for review.

### Discussion

I. **Motions for Summary Judgment**

Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

9

as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "When cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003).

In Counts One and Two of the complaint, McKay seeks a judgment declaring that an oral or implied-in-fact contract exists between McKay and RMH which encompasses three principal terms: (1) that RMH is obligated to keep McKay's idea confidential; (2) that if it chooses to pursue the idea, RMH is obligated to "[r]etain McKay as its agent to perform the work necessary to implement McKay's idea"; and (3) that McKay is obligated to "[p]ay McKay a fee of 20% of any additional revenues RMH receives as a result of McKay's idea for up to four years." (Compl. at 8-10). In moving for summary judgment as to both counts, RMH argues, inter alia, that there was no mutual assent to the essential terms alleged in the complaint, and that the alleged terms are too indefinite and uncertain to be enforceable.

Under Virginia law, which the parties agree is controlling, "[t]he base-line requirement for finding the existence of a contract, written, oral, implied, or otherwise, is a showing of mutual assent at the time of the agreement, i.e., the proverbial 'meeting of the minds.'" Hertz Corp. v. Zurich Am. Ins. Co., 496 F. Supp. 2d 668, 676 (E.D. Va. 2007) (quoting Snyder-Falkinham v. Stockburger, 457 S.E.2d 36, 39 (Va. 1995)). Both parties must share the same understanding as

to the purpose of the contract and as to each party's obligations thereunder. As the Supreme

Court of Virginia has explained:

> The parties must have a distinct intention common to both and without
> doubt or difference. Until all understand alike, there can be no assent, and,
> therefore, no contract. Both parties must assent to the same thing in the
> same sense, and their minds must meet as to all terms. If any portion of
> the proposed terms is not settled, there is no agreement.

Smith v. Farrell, 98 S.E.2d 3, 7 (Va. 1957) (internal citations and quotation marks omitted); see also Persinger & Co. v. Larrowe, 477 S.E.2d 506, 509 (Va. 1996) ("Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent and, therefore, no contract.").

In addition, contracting parties must mutually assent to terms that are reasonably certain. While the Supreme Court of Virginia has, at times, expressed a reluctance to declare a contract void for indefiniteness or uncertainty, see, e.g., High Knob, Inc. v. Allen, 138 S.E.2d 49, 53-54 (Va. 1964), the Court has nonetheless insisted that "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract." Allen v. Aetna Cas. & Sur. Co., 281 S.E.2d 818, 820 (Va. 1981). As the Supreme Court recently reaffirmed:

> [I]t is fundamental that no person may be subjected by law to a contractual
> obligation, unless the character of the obligation is definitely fixed by an
> express or implied agreement of the parties. In order to be binding, an
> agreement must be definite and certain as to its terms and requirements; it
> must identify the subject matter and spell out the essential commitments
> and agreements with respect thereto. The terms of the contract must be
> clear, definite, and explicit. A contract must be sufficiently definite to
> enable a court to give the contract an exact meaning, and the contract must
> obligate the contracting parties to matters that are definitely ascertained or
> ascertainable. A contract is not valid and it is unenforceable if the terms
> of the contract are not established with reasonable certainty.

Dodge v. Trustees of Randolph-Macon Woman's Coll., 661 S.E.2d 801, 803 (Va. 2008) (internal citations and quotation marks omitted).

Applying the aforementioned principles, the court concludes that no reasonable jury could find that McKay and RMH mutually assented to all of the essential terms outlined in the original complaint. While it is undisputed that Ms. Holsinger agreed to keep McKay's idea confidential, the record evinces no meeting of the minds as to the compensation and agency terms asserted by McKay. Moreover, the court concludes, as a matter of law, that the compensation and agency terms are not established with reasonable certainty.

First, the record contains no evidence of any meeting of the minds as to the compensation term that McKay asserts is binding. As previously stated, McKay's complaint requests a judgment declaring that RMH agreed to pay McKay a fee of "20% of any additional revenues" that RMH receives as a result of implementing McKay's idea. (Compl. at 8, 10). Prior to revealing McKay's idea, Mr. Brown informed Ms. Holsinger that McKay had identified "a significant reimbursement issue" worth "in excess of $500,000 per year." (RMH Ex. 43). At the time that McKay approached RMH, however, McKay had actually estimated that its proposal would yield over $8,000,000 per year in additional reimbursements. The stark disparity between the figure represented to RMH and the figure known to McKay leads to the inescapable conclusion that there was no meeting of the minds as to the extent of compensation sought by McKay. The fact that Mr. Brown stated that the idea was worth "in excess of $500,000" is of no moment; the $500,000 figure was such a gross under-representation of the estimated benefit that RMH could not have understood and assented to the particular compensation term that McKay

now seeks to enforce.[6] See Smith, 98 S.E.2d at 7. This conclusion is even more compelling given the parties' actions following the June 3, 2009 meeting. The fact that McKay and RMH continued to negotiate compensation "prevented [either party] from reasonably believing that they were already obligated by an enforceable agreement," and instead "confirm[s] that there was never a meeting of the minds." Cole v. Champion Enterprises, Inc., 305 F. App'x 122, 129 (4th Cir. 2008).

Moreover, the alleged agreement does not establish an explicit amount of compensation or a sufficiently definite method for calculating payment. See Mullins v. Mingo Lime & Lumber Co., 10 S.E.2d 492, 494 (1940) ("An agreement for service must be certain and definite as to . . . the compensation to be paid, or it will not be enforced."); Premier Signatures Int'l, Inc. v. Feld Entm't Prod., Inc., 1999 U.S. App. LEXIS 14028, at *6-7 (4th Cir. 1999) (unpublished) (holding that an alleged agreement between the parties was not an enforceable contract "because it was insufficiently certain as to at least one material term: namely the amount of the commission") (citing Mullins, supra). While McKay has asked the court to declare a compensation term of "20% of any additional revenues" resulting from the implementation of the idea, Mr. Brown described the fee in his May 26, 2009 email to Ms. Holsinger as "20% of the adjustment." In any event, neither term provides a reasonably ascertainable method of calculating the amount of

---

[6] It is undisputed that McKay intentionally concealed the actual magnitude of the benefit associated with its idea. During Michael McKay's deposition, Mr. McKay acknowledged that "it would not have been in McKay's best interest to tell RMH that it was dealing with a potential $8 million increase in reimbursements." (McKay Dep. at 199). When asked whether the more accurate amount was concealed "because the hospital might figure [the idea] out for themselves," McKay responded in the affirmative. (McKay Dep. at 200).

Additionally, McKay had reason to believe that disclosing the actual financial figures would dissuade RMH from considering the company's proposal. As RMH emphasizes in its brief in support of summary judgment, McKay's outreaches to New Hanover, Flagler, and St. Cloud had all been rejected when McKay was more forthright about the magnitude of the applicable benefit.

13

compensation in this case. As RMH emphasizes, there was no agreement regarding the meaning of the term "adjustment," the particular baseline that would be used in determining what revenues are "additional," or the type of revenues that would be considered when calculating the amount of compensation. For instance, it is unclear whether "revenues" would include revenues from all sources, only Medicare, or Medicare and Tricare. It is also not entirely clear whether the proposed rate of compensation would encompass all of the work necessary to implement the idea, or whether the mere use of the idea, alone, with substantially less attendant assistance from McKay, would require payment of the twenty percent commission. In short, the court concludes, as a matter of law, that the compensation term that McKay seeks to enforce is not sufficiently certain and, thus, that the contract is unenforceable.

Along the same lines, the court is constrained to conclude that no reasonable jury could find that the parties mutually assented to the agency term claimed by McKay. The scope of services encompassed by the agency relationship was not described in any correspondence from McKay prior to the date on which it presented its idea to the hospital. At the time that RMH allegedly agreed to retain McKay as its agent, RMH had only been advised that the proposed services concerned a reimbursement opportunity that McKay had identified using RMH's cost reports and that the opportunity was potentially worth in excess of $500,000. The $500,000 figure, which grossly understated the estimated benefit, suggested an idea, and concomitant services, that were entirely different than those which were ultimately presented to RMH. Indeed, the record reveals that, based on the representations made by McKay prior to the June 3, 2009 meeting, RMH completely misjudged the actual nature of McKay's idea. Before the meeting, Ms. Holsinger noted that it was going to involve "something that will get us $500,000

per year in the Medicare cost report." (RMH Ex. 44). She testified that "[a]ll of the documentation that [she] had received up to this point led [her] to believe that it was going to be reopening cost reports that were already closed and that there would be adjustment." (Holsinger Dep. at 112-133). Based on the foregoing, it is clear from the record that McKay and RMH did not agree "to the same thing in the same sense" as to the nature and scope of services to be provided by McKay. Smith, 98 S.E.2d at 7.

The court further concludes that the alleged agency arrangement is so indefinite and nebulous as to preclude a determination that there was a binding agreement. Prior to disclosing the idea, Mr. Brown merely stated by email that "we'll ask that . . . you'll use McKay as your agent" if you choose to address the issue. (RMH Ex. 46). Again, there was no discussion regarding the scope of services to be provided by McKay, the timing of those services, or the duration of the exclusivity arrangement. Indeed, it is impossible to determine, even after the idea's disclosure, what services McKay would be required to perform under the alleged agreement.[7]

---

[7] In this regard, the May 26, 2009 email containing the agency term that McKay now seeks to enforce stands in stark contrast with the much more detailed contract that McKay ultimately entered into with another hospital, St. Joseph's Medical Center of Stockton ("St. Joseph's"). The St. Joseph's contract centered on the implementation of an idea similar to that proposed to RMH. McKay initially presented St. Joseph's with a short proposed contract. However, that document was used only as a starting point for more thorough negotiations. Counsel for St. Joseph's ultimately prepared a 22-page contract that included, among other things, a section entitled "General Obligations of Consultant" that contained eleven subsections. (RMH Ex. 65). The first subsection, "Services," referred to a separate attachment that detailed the services to be rendered in two, single-spaced pages. (RMH Ex. 65).

Here, at no time prior to the formation of the alleged contract, nor during its post-disclosure negotiations, did McKay explain its proposed services to RMH, let alone provide a level of detail comparable to the St. Joseph's agreement.

At most, the record suggests that the parties reached an agreement to agree on certain terms in the future. Mr. Brown's May 26, 2009 email, itself, appeared to forecast a future agreement between the parties. See RMH Ex. 46 (stating that "we'll ask that you do keep its nature confidential and that . . . you'll use McKay Consulting as your agent"). This conclusion is buttressed by the fact that Mr. King and Mr. McKay continued to discuss compensation terms following the disclosure of the idea, and the fact that the parties contemplated the execution of a written contract. Even if the parties did agree to reach an agreement in the future, however, such agreements are unenforceable under Virginia law. See, e.g., Kay v. Prof. Realty Corp., 281 S.E.2d 820, 822 (Va. 1981); Premier Signatures Int'l, Inc., 1999 U.S. App. LEXIS 14028 at *3, n.4.

In sum, the court concludes that there is no evidence from which a reasonable jury could find that the parties mutually assented to the compensation and agency terms set forth in the original complaint. The court further concludes that the compensation and agency terms are unenforceable as a matter of law, due to their indefiniteness and uncertainty. The court therefore agrees with RMH that no enforceable contract, either express or implied, existed between the parties, as claimed in the original complaint. Accordingly, the court will grant RMH's motion for summary judgment and deny McKay's cross-motion for partial summary judgment.

## II.    Motion to Amend

During the hearing on the motions for summary judgment, the court raised questions concerning the viability of a contract comprised of only two essential terms: (1) an agreement as to confidentiality; and (2) an agreement that RMH will use McKay as its agent if it chooses to implement McKay's idea. Possibly in light of the court's questions, McKay filed a motion to

amend its complaint to allege, in the alternative, the existence of an oral or implied-in-fact contract by which RMH agreed only to these two terms and not to a particular rate of compensation.

Although leave to amend should be "freely give[n] when justice so requires," Fed. R. Civ. P. 15(a)(2), the court "may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 603 (4th Cir. 2010) (citing Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006)). In this case, the court concludes that granting leave to amend would be futile because the complaint, as amended, would not withstand a motion for summary judgment. See, e.g., Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007) (explaining that "[l]eave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant").

The court's decision in this regard is based on the same basic legal requirements discussed above: (1) that contracting parties must mutually assent as to all terms; and (2) that the terms of the contract must be reasonably certain under the circumstances. See, e.g., Smith, 98 S.E.2d at 7; Allen, 281 S.E.2d at 820; Dodge, 661 S.E.2d at 803. Here, regardless of whether the alleged contract contains the three terms identified in the original complaint or the two terms asserted in the alternative, in the proposed amended complaint, the uncertainty and lack of mutual assent with respect to the agency term is fatal to the formation of an enforceable contract.

It is axiomatic that a contract for services, whether express or implied, requires mutual assent to the essential terms of "the nature and extent of service to be performed . . . or it will not be enforced." Mullins, 10 S.E.2d at 494. Thus, in cases involving proposed ideas and attendant

17

services, courts have refused to uphold alleged agreements where the nature and extent of the services are not sufficiently defined. See, e.g., BDT Products, Inc. v. Lexmark Int'l, Inc., 274 F. Supp. 2d 880, 886 (E.D. Ky. 2003) (explaining that, for an implied-in-fact contract to exist, "[t]here must be at least some semblance of definiteness as to what services were to be rendered, when they were to begin and how long they were to last, and what was promised in recompense for the services"); Bergin v. Century 21 Real Estate Corp., 2000 U.S. Dist. LEXIS 2088, at *17 (S.D. N.Y. Feb. 25, 2000), aff'd, 234 F.3d 1261 (2d Cir. 2000) (holding that no implied-in-fact contract existed where there was no agreement concerning compensation or the services to be provided by the consultant); Marriccini v. Bertelsmann Music Group, Inc., 221 A.D.2d 95, 97 (N.Y. App. 1996) (holding that the terms allegedly agreed to were "far too indefinite to constitute an enforceable contract," where the plaintiff "agreed to disclose the details of her proposal in return for an indefinite payment, confidentiality, an undefined job and an undefined equity stake").

While the court acknowledges that the Supreme Court of Virginia has, at times, expressed a reluctance to declare a contract void for indefiniteness and uncertainty, see High Knob, Inc., 138 S.E.2d at 53, the Supreme Court has nonetheless made clear that "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract," Allen, 281 S.E.2d at 820. In this case, for the reasons previously discussed, it is clear from the record that there was no such mutual commitment as to the nature of the proposed agency relationship or the extent of the services to be provided by McKay. Consequently, the two-term contract that McKay wishes to plead in its proposed amended

complaint "is too vague and indefinite to be enforced." Id. Accordingly, the motion to amend must be denied as futile.

## Conclusion

For the reasons stated, the court concludes that no enforceable agreement was formed between McKay and RMH, either express or implied, which included the terms pled in the original complaint or the proposed amended complaint. As such, the court finds it unnecessary at this time to consider the parties' remaining arguments, or the possibility of any equitable remedy McKay might possess if RMH decides to implement McKay's idea in the future.[8] The court will grant RMH's motion for summary judgment, deny McKay's cross-motion for partial summary judgment, and deny McKay's motion to amend.

The Clerk is directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 11th day of August, 2010.

_____
Chief United States District Judge

---

[8] The court notes that the central theme of this opinion is uncertainty of performance. Lack of specificity has proven fatal to McKay's case. Stated differently, McKay's legal position has proven precarious because RMH has neither utilized the idea nor has given any indication that it plans to do so. If RMH ultimately chooses to implement the idea, it is at least arguable that McKay will have a basis for recovery under a theory of unjust enrichment. See, e.g., Schmidt v. Household Fin. Corp., II, 661 S.E.2d 834, 838 (Va. 2008) (explaining that a viable claim for unjust enrichment requires proof that the plaintiff conferred a benefit on the defendant; that the defendant knew of the benefit and should reasonably have expected to pay for it; and that the defendant accepted or retained the benefit without paying for its value); see also Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 993-994 (4th Cir. 1990) (discussing the elements encompassed by this equitable remedy).